# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re:* Defendants Liberty Mutual Insurance Company, *et al.'s* Subpoena to Fr. Thomas Patrick Doyle. | Case: 1:18-mc-00070<br>Assigned To : Boasberg, James E.<br>Assign. Date : 5/18/2018<br>Description: Misc. |
| Diocese of Duluth<br><br>Plaintiff,<br><br>V.<br><br>Liberty Mutual Insurance Company, *et. al.*<br><br>Defendants. | District of Minnesota Case No.:<br>0:17-cv-03254-DWF-LIB |

## THOMAS PATRICK DOYLE'S MOTION TO QUASH SUBPOENA DIRECTED TO HIM AS A NON-PARTY EXPERT IN THE ABOVE-NAMED MATTER

TO THE COURT AND ALL PARTIES OF RECORD:

PLEASE TAKE NOTICE that pursuant to Rules 45 and 26 of the Federal Rules of Civil Procedure, Fr. Thomas Patrick Doyle, by and through undersigned counsel, respectfully moves this Court to quash the multiple subpoenas served upon him in April and May 2018 by Liberty Mutual Insurance Company ("Liberty Mutual").[1]

### BACKGROUND

---

[1] Pursuant to Federal Rule of Civil Procedure 45(d)(3)(A), Fr. Doyle files this motion in this Court as the court for the district where compliance is required.

1

In 2015, at least five Plaintiffs filed lawsuits against the Diocese of Duluth alleging childhood sexual abuse by priests within that Diocese. One of those cases, <u>Weis v. Diocese of Duluth</u>, went to trial and resulted in a 4.9-million-dollar verdict against the Diocese of Duluth. The <u>Weis</u> case was the first to go to trial under the Minnesota Child Victims Act, and many more were filed so, following the verdict, in December 2015, the Diocese filed for Bankruptcy. After filing for bankruptcy, the Diocese then filed a declaratory Judgment action against its insurers seeking coverage for claims arising from clergy sexual abuse. That is the underlying case here.

Fr. Thomas Doyle, the subject of the subpoena at issue here, was ordained a Roman Catholic Priest in the Dominican Order in 1970. He has the following degrees: B.A. in Philosophy, Aquinas Institute of Philosophy, River Forest, Illinois granted in 1966; M.A. in Philosophy, Aquinas Institute of Philosophy, 1968; M.A. in political science, University of Wisconsin, 1971; M.A. in theology, Aquinas Institute of Theology, Dubuque, Iowa, 1971; M.Ch.A., Catholic University of America, Washington, D.C., 1976; M.A. in Canon Law, University of Ottawa, Ottawa, Ontario, 1977; J.C.L. (Pontifical Licentiate in Canon Law) St. Paul University in Ottawa, Canada, 1977 and a J.C.D. (Pontifical Doctorate in Canon Law), Catholic University of America, 1978. I am also a fully certified addictions counselor. He graduated from the Naval School of Health Sciences in San Diego.

He has served on the faculty and as adjunct faculty for several different universities, and he has written several books related to theology, canon law and childhood sexual abuse within the Roman Catholic Church. He has appeared before at least six state legislatures.

As a priest, Fr. Doyle had several assignments, none of which were in Minnesota. Since 1988, Fr. Doyle has served repeatedly as an expert witness regarding clergy sexual abuse and the interpretation of church documentation. He has studied the documentation of almost all of the 195 dioceses in the United States in an expert witness capacity. He has qualified as an expert

in hundreds of civil courts in the United States and in courts in Israel, Ireland and Canada.

Fr. Doyle is not a party in the underlying lawsuit, <u>Diocese of Duluth v. Liberty Mutual Insurance Company, et. al</u>, Dist. of Minn No. 0:17-cv-03254-DWF-LIB. He has never been to the Diocese of Duluth. He has never worked within the Diocese of Duluth. He does not know the Bishop in Duluth and he does not know any of the parties involved in the underlying lawsuit. He has no personal or first-hand information regarding the Diocese of Duluth or the underlying case. He did testify as an expert witness in <u>Weis v. Diocese of Duluth</u>. In that capacity, he was retained to review documents and testify regarding his research into childhood sexual abuse in the Roman Catholic Church.

Despite Fr. Doyle's lack of any factual connection to or knowledge regarding the underlying lawsuit, Defendants have served at least four different subpoenas upon him to produce documents and testify in the matter. They have scheduled and/or re-scheduled his deposition for four different dates including May 21, 2018, May 3, 2018, May 11, 2018, and May 5, 2018. The most recent subpoena was served on May 8, 2018 and scheduled the deposition to take place three days later on May 2, 2018.[2]

Each subpoena served on Fr. Doyle has the same schedule "A" attached. (Exhibit 1). Schedule "A" is eight pages long and consists of document requests and "Topics for Testimony."

Both the documents requested and topics for testimony seek Fr. Doyle's expert work and opinions.

## **ANALYSIS**

---

[2] This Motion to Quash is timely as it is filed within 14 days of after the currently pending subpoena was served. <u>Ht S.R.L. v. Velasco</u>, 125 F. Supp. 3d 211, 219, 2015 U.S. Dist. LEXIS 114409, *9 (D.D.C. August 28, 2015).

According to Federal Rule of Civil Procedure 45, the Court is permitted to quash a subpoena under the circumstances presented in this case.

> To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
>
> (i) disclosing a trade secret or other confidential research, development, or commercial information; or
>
> (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.[3]

Fed.R.Civ.Pro. All of the documentary information Defendant Liberty Mutual seeks is information that if Fr. Doyle possesses, he possesses solely through his expert work in the Weis case. This information is not appropriately gathered from Fr. Doyle but is more appropriately requested from the Plaintiff in the underlying case - the Diocese of Duluth directly. Defendant Liberty Mutual either has not requested this information properly from the opposing party in the underlying case or did so and was told by the Minnesota Federal Bankruptcy Court that it was not entitled to this information. Either way, Fr. Doyle should not pay the price.

As an example of the information that Defendant Liberty Mutual requests from Fr. Doyle, they seek documents related to the corporate structure of the Diocese of Duluth, documents related to the Diocese's policies, and documents related to the Diocese's relationship with the Order of the Oblates. (See Exhibit 1). These documents are not appropriately requested from a third-party non-retained expert witness. This is especially true when Defendant can and should request these documents from the Plaintiff in the underlying case.

Similarly, Liberty Mutual requests that Fr. Doyle prepare to discuss the corporate

---

[3] Tellingly, the time for Defendant Liberty Mutual to hire and disclose an expert witness in the underlying case has expired.

4

structure, policies, and perpetrator assignments of the Diocese of Duluth at a deposition. Essentially, they are asking him to do expert research for them. This is not permissible. "In a society where knowledge is so valuable, there is something unfair about the courts permitting their processes, such as the issuance of a subpoena, to destroy that market in order to take for free the product of an individual's diligence, research, and expertise." Statutory Comm. of Unsecured Creditors v. Motorola, Inc., 218 F.R.D. 325, 326, 2003 U.S. Dist. LEXIS 21059, *3 (D.D.C. November 24, 2003).

The fact that this information is so easily accessible to Defendant Liberty Mutual in the underlying case leads one to speculate that it is not the documents and the facts that Liberty Mutual truly seeks with this subpoena of Fr. Thomas Doyle. Likely, what they truly seek are his expert opinions regarding whether the Diocese of Duluth knew about the perpetrator priests withing its ranks and failed to notify their insurer. This is exactly the type of forced expert testimony that Federal Rule of Civil Procedure 45(d)(3)(B)(ii) intends to protect. Allowing Defendant Liberty Mutual to use subpoena power in this way would be allowing them to abuse the court process in order to force a person to work for them against his will.

There is nothing on schedule A of which Fr. Doyle has personal first-hand knowledge. There is no topic relevant to the underlying case about which Fr. Doyle could testify without doing expert research and forming expert opinions.

It makes no difference that Fr. Doyle may have done some of this expert work in the past such that Defendant may claim it seeks only past opinion and work product that Doyle already possesses. Such an exception to the rule would eviscerate its purpose. Statutory Comm. of Unsecured Creditors v. Motorola, Inc., 218 F.R.D. 325, 327, 2003 U.S. Dist. LEXIS 21059, *3 (D.D.C. November 24, 2003). Similar to a DNA laboratory analyst, merely because the

expert had testified at one trial does not mean that every defendant thereafter gets that expert to testify in their case for free. Accordingly, the subpoena should be quashed.

In addition, the subpoena at issue would create an undue hardship for Fr. Doyle. "Pursuant to the discretion granted by Rule 45(b), this Court must be sensitive to the potential burden imposed on a non-party during discovery." Pollitt v. Mobay Chemical Corp., 95 F.R.D. 101, 105, 1982 U.S. Dist. LEXIS 14003, *11, 34 Fed. R. Serv. 2d (Callaghan) 1272 (S.D. Ohio July 26, 1982).

Here, Fr. Doyle has serious personal obligations that prevent him from being able to comply with the subpoena. He is the sole care-taker for a close friend who is undergoing cancer treatment, and he is scheduled for knee-replacement surgery on May 17, 2018, which has a six-week recovery period.

## CONCLUSION

The subpoena served upon Fr. Doyle is improper and constitutes an abuse of process. The subpoena should be quashed, and Defendant should be made to pay Fr. Doyle's costs in responding to this matter. Defendant has harassed him by sending process servers to his home at least four times. He was cooperative in accepting each subpoena, telling them his availability concerns each time. Most recently, Defendant gave him three days notice thus forcing him to hire counsel on an emergency basis. He had to hire counsel to address this issue at his own cost.

WHEREFORE, Fr. Thomas Doyle respectfully requests that this Court quash the subpoena at issue and award costs and attorney fees.

Respectfully submitted,

/s/Nicole Gorovsky
Nicole E. Gorovsky (*pro hac vice pending*)
*Pro Hac Vice Request Pending* (MO. 51046)
Gorovsky Law, LLC
13321 North Outer Forty Rd.
Suite 500
Town and Country, MO 63017
Telephone: (314) 272-3255
Email: Nicole@gorovskylaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 17th day of May, 2018 the foregoing was served via electronic mail in PDF format to attorneys for Defendants:

Nancy D. Adams Esq.
Mathilda S. McGee-Tubb, Esq.
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, PC.
One Financial Center
Boston, Massachusetts 02111
nadams@mintz.com
msmcgee-tubb@mintz.com


Kristi K. Brownson
BROWNSON NORBY PLLC
225 South Sixth St., Suite 4800
Minneapolis, MN 55402
kbrownson@brownsonnorby.com

*Attorneys for Defendant Liberty Mutual Insurance*

/s/ Nicole E. Gorovsky

# SCHEDULE A
## TO FED. R. CIV. P. 45 SUBPOENA
## TO FR. THOMAS PATRICK DOYLE

### DEFINITIONS

1. The term "Diocese" means the Plaintiff Diocese of Duluth and the bishops in pastoral care of the Diocese of Duluth, including, but not limited to, Bishop Thomas Welch, Bishop Francis J. Schenk, and Bishop Paul Anderson.

2. The term "Priest" means priest, pastor, assistant pastor, associate pastor, curate, parochial vicar or administrator.

3. The term "Parish" means a "a certain community of Christ's faithful stably established within a particular Church [diocese], whose pastoral care, under the authority of the diocesan Bishop, is entrusted to a parish priest as its proper Pastor." *See* Canon 515.

4. The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), whether oral or written.

5. The term "Representative" or "representatives" used with reference to a person means (a) officers, directors, partners, associates, employees, servants, agents, subsidiaries, and affiliates of such person and (b) other persons acting on behalf of, or in concert with, such person.

6. The term "Canon" means the Code of Canon Law promulgated by Pope Benedict XV in 1917.

7. The term "Alleged Perpetrators" refers to the following individuals:
   - John Nicholson
   - James Vincent Fitzgerald
   - Anthanese Fuchs
   - Frederick Fox

1

- Cornelius Kelleher
- Dennis Puhl
- John Golobich
- Felix T. Kuras
- Leonard Colston
- Donald Green
- Robert Klein
- Roland Antus
- William Buschette
- William Graham

8. The "1962 Vatican Document" refers to the "*De Modo Procedendi in Causis Solicitationis*", dated March 16, 1962.

9. The term "Bishop" means the bishops in pastoral care of the Diocese of Duluth between 1954 and 1983, including, but not limited to, Bishop Thomas Welch, Bishop Francis J. Schenk, and Bishop Paul Anderson.

10. The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

## INSTRUCTIONS

1. Unless otherwise specified, this notice requests documents referring or relating to the time period from 1954 to the present.

2. The singular shall be deemed to include the plural, where appropriate, and vice versa.

3. The words "and" and "or" shall be construed conjunctively or disjunctively as is necessary to make the request inclusive rather than exclusive. The word "including" shall be construed to mean without limitation.

6. Each request that seeks information relating in any way to communications, to, from, or within a business and/or corporate entity, is hereby designated to demand, and should be construed to include, all communications by and between representatives, employees, agents, brokers and/or servants of the business and/or corporate entity.

7. In the event that you are able to provide only part of the information called for by any particular request, you are requested to provide all of the information which you can provide and to state the reason(s) for the alleged inability to provide the remainder.

8. If you assert any privilege in responding to these requests, state the type of privilege asserted and the basis for its assertion. In addition, briefly identify the communication or document with respect to which the privilege is asserted. For any document with respect to which a privilege is asserted, state:

   a. The type of document (e.g., letter, memorandum, contract, etc.), the date of the document, and the subject matter of the document;

   b. The name, address and position of the author of the document and of any person who assisted in its preparation;

   c. The name, address and position of each addressee or recipient of the document or any copies of it; and

   d. The present location of the document and the name, address and position of the person having custody of it.

9. For any communication with respect to which a privilege is asserted, please identify the persons or entities among whom the communication took place, the date of the communication, and the subject.

10. In responding to each request, you shall make inquiry of your agents, servants and attorneys and examine such documents as will enable you to make complete and true responses to these requests.

## DOCUMENT REQUESTS

1. All documents and communications relating to the corporate structure of the Diocese prior to 1983.

2. All documents and communications relating to the Diocese's policies, practices and procedures relating to the appointment, assignment, reassignment, removal, supervision and monitoring of priests within the Diocese before 1983.

3. All documents and communications relating to parish assignments for the Alleged Perpetrators and information sought, obtained, or examined by the bishop in connection with the assignment or reassignment of each of the Alleged Perpetrators to a parish.

4. All documents and communications relating to the Diocese's relationship and interaction with the Oblates of Mary Immaculate ("Oblates"), including, but not limited to: (i) any communications between the Diocese and the Oblates prior to 1983; and (ii) the assignment of any pastor or cleric assigned to, or reassigned from, the Oblates who served in a parish of the Diocese.

5. All documents and communications relating to the Diocese's sexual misconduct policy between 1954 and 1983.

6. All documents and communications relating to reports, complaints, claims, demands or lawsuits and any subsequent investigation into any such reports, complaints, claims, demands or lawsuits, including any documentation of any such investigation, regarding the alleged sexual misconduct or alleged sexual abuse before 1983.

7. All documents and communications relating to any payments of the Diocese to alleged victims of sexual abuse or sexual misconduct, including any documentation reflecting such payments, with respect to alleged sexual abuse or misconduct.

8. All documents and communications relating to any monitoring program by the Diocese for any priest who was alleged to have sexually abused or molested a minor before 1983.

9. All documents and communications relating to investigations of the alleged perpetrators or alleged sexual abuse before 1983, including (i) the results of such investigations, regardless of whether such records were placed in secret archives pursuant to Canon 1946, § 2; and (ii) any disciplinary action or penal remedies imposed, regardless of whether such action was conducted in secret pursuant to Canon 2309.

10. All documents and communications relating to the Diocese's policies, practices and procedures relating to treatment for priests for emotional, sexual, psychological, psychosexual, pedophilia, alcohol and substance abuse issues or problems between 1954 and 1983.

11. All pleadings, discovery, and reports in the Weis v. Diocese of Duluth action, No. 62-CV-14-871, County of Ramsey District Court, Second Judicial District (Minnesota).

12. All documents used to prepare for your testimony in the Weis v. Diocese of Duluth action, No. 62-CV-14-871, County of Ramsey District Court, Second Judicial District (Minnesota).

## TOPICS FOR TESTIMONY

1. Your testimony in Weis v. Diocese of Duluth action, No. 62-CV-14-871, County of Ramsey District Court, Second Judicial District (Minnesota).

2. The corporate structure of the Diocese prior to 1983.

3. The Diocese's policies, practices and procedures relating to the appointment, assignment, reassignment, removal, supervision and monitoring of priests within the Diocese before 1983.

4. Parish assignments for the Alleged Perpetrators and information sought, obtained, or examined by the bishop in connection with the assignment or reassignment of each of the Alleged Perpetrators to a parish.

5. The Diocese's relationship and interaction with the Oblates of Mary Immaculate ("Oblates"), including, but not limited to, the assignment of any pastor or cleric assigned to, or reassigned from, the Oblates who served in a parish of the Diocese.

6. The Diocese's sexual misconduct policy between 1954 and 1983.

7. Reports, complaints, claims, demands or lawsuits and any subsequent investigation into any such reports, complaints, claims, demands or lawsuits regarding the alleged sexual misconduct or alleged sexual abuse before 1983.

8. Payments of the Diocese to alleged victims of sexual abuse or sexual misconduct, including any documentation reflecting such payments, with respect to alleged sexual abuse or misconduct.

6

9.  Any monitoring program by the Diocese for any priest who was alleged to have sexually abused or molested a minor before 1983.

10. Investigations of the alleged perpetrators or alleged sexual abuse before 1974, including (i) the results of such investigations, regardless of whether such records were placed in secret archives pursuant to Canon 1946, § 2; and (ii) any disciplinary action or penal remedies imposed, regardless of whether such action was conducted in secret pursuant to Canon 2309.

11. The Diocese's policies, practices and procedures relating to treatment for priests for emotional, sexual, psychological, psychosexual, pedophilia, alcohol and substance abuse issues or problems between 1954 and 1983.

Respectfully submitted,

**THE CONTINENTAL INSURANCE COMPANY**

By its attorneys,

/s/ *Andrea Reisbord*
**BASSFORD REMELE**
100 South Fifth Street
Suite 1500
Minneapolis MN 55402
612-376-1671
612-746-1271 (Facsimile)
areisbord@bassford.com

and

/s/ *Scott E. Turner*
Scott E. Turner
Greta A. Matzen
CNA COVERAGE LITIGATION GROUP
333 South Wabash Avenue – 25th Floor
Chicago IL 60604
312-822-4571
312-817-2486 (Facsimile)
scott.turner@cna.com
greta.matzen@cna.com

Date: April 10, 2018